J-S49002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  TERMINATION OF PARENTAL RIGHTS TO N.T.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  N.I.C., JR., Appellant | No. 697 MDA 2015 |

Appeal from the Decree Entered March 23, 2015
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2014-0161

BEFORE:  BENDER, P.J.E., ALLEN, J., and OLSON, J.

MEMORANDUM BY BENDER, P.J.E.:               **FILED SEPTEMBER 01, 2015**

N.I.C., Jr. ("Father"), appeals from the orphans' court's decree, entered on March 23, 2015, involuntarily terminating his parental rights to his daughter, N.T.C., born in September of 2008.[1]  After careful review, we affirm.

At the termination hearing, the following testimony was presented. First, Grandmother testified that in May of 2011, Mother brought N.T.C. to Grandmother's and Grandfather's home in Baltimore, Maryland, and asked if N.T.C. "could remain with [them] until [Mother] found a place to live…." N.T. Hearing, 3/20/15, at 3, 13.  Grandmother and Grandfather agreed to care for N.T.C. temporarily, but Mother never returned for N.T.C.  *Id.* at 3.  As

---

[1] The record indicates that the parental rights of N.T.C.'s biological mother, L.M.S. ("Mother"), were terminated by order dated February 11, 2015, and Mother did not appeal.  That same order awarded custody to N.T.C.'s maternal grandparents, N.M.N. ("Grandmother") and E.C.N. ("Grandfather"), who petitioned to terminate Father's parental rights in the present case.

such, at the time of the termination hearing, N.T.C. had been living with Grandmother and Grandfather since May of 2011. *Id.* at 3-4.

Grandmother further testified that Father knew N.T.C. was living with her and Grandfather, and he knew Grandmother's cell phone number and the address of their home in Baltimore, which he had visited before. *Id.* at 4-5. Grandmother testified that she recalled Father calling her cell phone twice - once on N.T.C.'s third birthday, and then "around December of 2011, around Christmas." *Id.* at 6, 14. Father also sent money to N.T.C. in December of 2011. *Id.* at 9. Grandmother testified that when she spoke with Father in December of 2011, she told him that he could visit N.T.C. "whenever he want[ed] to." *Id.* at 14. However, Grandmother did not recall Father making any attempt to contact or visit with N.T.C. after that December 2011 communication. *Id.* at 11. In October of 2013, Grandmother and Grandfather moved with N.T.C. to Pennsylvania. *Id.* at 6.

Grandfather also testified at the hearing. He stated that in December of 2011, he spoke with Father and informed him that "if he wanted to see his daughter and talk to his daughter, he was welcome to." *Id.* at 25. Grandfather also testified that he told Father he could contact N.T.C. by calling either Grandmother's or Grandfather's cell phone. *Id.* Grandfather said that later that month, at Christmastime, Father sent around $150 for N.T.C. *Id.* Grandfather said that after December of 2011, Father did not contact them to schedule a visit with N.T.C., nor did he call or leave messages inquiring about the child. *Id.* at 26. Grandfather testified that

Father knew his cell phone number after their conversation in December of 2011, and Grandfather's phone number never changed. *Id.* Grandfather further testified that in 2012, he contacted Father regarding Grandmother's and Grandfather's claiming N.T.C. as a dependent for income tax purposes. *Id.* at 27. At that time, Father did not ask to speak to N.T.C. or inquire about how she was doing. *Id.* at 28, 33. Grandfather did not hear from Father again after that conversation in 2012. *Id.*

Next, Father took the stand at the termination hearing. Father testified that after N.T.C. was born in September of 2008, she lived with Father and Mother in Georgia until approximately August of 2010. *Id.* at 34-35. At that time, Father relocated to Philadelphia and N.T.C. remained with Mother. *Id.* at 35. Father testified that he did not obtain employment in Philadelphia until 2012. *Id.* at 38. He stated that he knew that N.T.C. was living in Baltimore in 2011, and claimed that he "kept in touch with [N.T.C., Grandmother, and Grandfather] the best way [he could,]" but doing so was difficult because he did not have a job, money, or a car. *Id.* at 40, 42. He testified that he did call N.T.C. but Grandmother "always pick[ed] up the phone." *Id.* Father stated that after speaking to N.T.C., Grandmother, and Grandfather in December of 2011, he "tried calling" but "[n]ever got through." *Id.* at 46. Father testified that he never left a message when he called. *Id.* at 47.

In regard to visiting N.T.C., Father stated that he "drove up to Baltimore" in August of 2013, but the address he had was not the residence

where N.T.C. was living. *Id.* at 47-48. Father testified that "that was the last time [he] even tried to … make any kind of contact." *Id.* at 48. Father stated that he was unable to call N.T.C. because he "lost [the] cell phone number" he had for Grandmother or Grandfather. *Id.* Father tried searching for Grandmother and Grandfather, on social media to regain contact with N.T.C., but was unable to find them. *Id.* at 49. Father testified that ultimately, he had no way to get in touch with Grandmother, Grandfather, or N.T.C. for "[t]he last two years…." *Id.* at 51.

At the close of the termination proceeding, the orphans' court stated that it "found [Grandmother and Grandfather] to be very credible," and "[t]here were portions of [Father's] testimony that [the court] did not find to be very credible." *Id.* at 91. The court elaborated, in pertinent part:

> We are at a loss as to why [Father] would never leave a message if he was interested in contacting [N.T.C.]. We are not so certain he made as many calls as he indicated he did.
>
> Essentially, [Father] says that he looked long and hard for his child by doing searches on Facebook and other social media type[ websites,] and alleges that he did that for several months, and we are not certain that is very credible, either.
>
> And [Father] did indicate that throughout this time period, he was employed. He did not testify that he was impoverished to the point that he couldn't again drive to Baltimore or go through other matters, contact an attorney, a private investigator, or anyone else to track down [Grandmother and Grandfather] or his daughter.
>
> We do not believe that [Father] made any substantial effort to attempt to bond with his child….

*Id.* at 91-92.

Based on these findings, the orphans' court concluded that Grandmother and Grandfather had proven that Father's parental rights should be terminated under 23 Pa.C.S. § 2511(a)(1), which states:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

Consequently, the court issued a decree – entered on the lower court's docket on March 23, 2015 – granting Grandmother's and Grandfather's petition to involuntarily terminate Father's parental rights to N.T.C.

Father filed a timely notice of appeal and statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2). Herein, Father raises the following issue for our review:

1. Whether the Order involuntarily terminating [Father's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) was supported by sufficient evidence where during the six month time period preceding the filing of the adoption petition, [Father] did not know where his daughter live[d] or how to contact her?

Father's Brief at 2.

We review Father's appeal according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if

they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***In re R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id***.; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id***.

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the

Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

- 6 -

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Herein, Father's challenges only the orphans' court's finding that section 2511(a)(1) was satisfied.[2] This Court has expounded on the requirements of terminating parental rights under this subsection of the Adoption Act, as follows:

A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition. **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) ( *en banc*). Although the six month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision. **In re**

---

[2] Father does not challenge the orphans' court's decision regarding section 2511(b). Accordingly, any issue regarding that subsection is not before us. **See R.N.J.**, 985 A.2d at 277 n.6 (citing **In re Smith**, 874 A.2d 131, 137 n.5 (Pa. Super. 2005) (stating this Court may not, with limited exceptions for jurisdictional issues, *sua sponte* address issues not raised by the parties).

> ***K.Z.S.****,* 946 A.2d 753, 758 (Pa.Super.2008). The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination. ***In re B***[***.***]***, N.M.,*** 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005).

***In re I.J.****,* 972 A.2d 5, 10 (Pa. Super. 2009).

Here, Father argues that prior to N.T.C.'s moving to Pennsylvania, he did make efforts to contact and/or visit her in Baltimore. However, when Grandmother and Grandfather relocated N.T.C. to Pennsylvania in October of 2013, Father had no way of contacting N.T.C. because he did not know where she was living. Father also emphasizes that he attempted to find N.T.C. by searching social media sites on the internet, but was unsuccessful. Based on these facts, Father asserts that the court erred by concluding that he had a 'settled purpose to relinquish' his parental rights to N.T.C.

We disagree. The orphans' court explicitly stated that it found Grandmother's and Grandfather's testimony credible, and both grandparents stated that after December of 2011, Appellant made no effort to communicate with or visit N.T.C., despite their telling Father that they would allow him to do so. The orphans' court also stated that it disbelieved Father's claims that he repeatedly called Grandmother and/or Grandfather, and noted that Father never left messages during these ostensible phone calls.

In regard to Father's actions after N.T.C. moved to Pennsylvania, the orphans' court did not believe Father's testimony that he "looked long and hard for his child" by using the internet. N.T. at 91. In any event, the court

also emphasized that Father had a job at this time, yet he took no other steps to ascertain N.T.C.'s whereabouts, such as contacting an attorney or private investigator. In sum, the court found that Father had not "made any substantial effort to attempt to bond with his child…." *Id.* at 92. Consequently, the court found that Father, "by a period of conduct for at least six months before the filing of this [termination] petition, evidenced a settled purpose of relinquishing his parental claim to the child and that he has failed to perform any parental duties." *Id.*

The record supports the orphans' court's factual findings and credibility determinations, and we ascertain no abuse of discretion in the court's legal determination that section 2511(a)(1) was satisfied. According to Grandmother and Grandfather, Father made little effort to maintain a relationship with N.T.C. from May through December of 2011, and had no contact with the child from December of 2011 until the time of the termination hearing in March of 2015. The record indicates that from May of 2011 until October of 2013, Father knew where N.T.C. was living in Baltimore, as well as the phone numbers of Grandmother and Grandfather, yet Father never visited N.T.C. and called only twice. After October of 2013, Father only attempted to locate N.T.C. by internet searches. We agree with the court that this evidence supported termination of Father's parental rights under section 2511(a)(1). Again, Father presents no argument pertaining to the court's analysis of section 2511(b); therefore, we do not address that issue.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/1/2015